**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**UNITED STATES OF AMERICA,**
        Plaintiff,

  v.                                          Case No. 98-CR-104

**WILFREDO VASQUEZ,**
        Defendant.

---

### MEMORANDUM

Re-consideration of the sentence of defendant Wilfredo Vaquez is before me on a limited remand pursuant to United States v. Paladino, 401 F.3d 471 (7th Cir. 2005). United States v. Olson, 450 F.3d 655, 682-83 (7th Cir. 2006). I originally sentenced defendant to life imprisonment under the then-mandatory sentencing guidelines. I must now decide, pursuant to the procedure set forth in Paladino, whether I would adhere to the original sentence knowing that the guidelines are now advisory. I must then either place on the record a decision not to re-sentence, with an appropriate explanation, or inform the court of appeals of my desire to re-sentence defendant, in which case the appellate court will vacate and remand for re-sentencing. See Paladino, 401 F.3d at 484.

Upon review of the parties' Paladino submissions and the entire record, I conclude that I would impose the same sentence in light of the additional discretion afforded by United States v. Booker, 543 U.S. 220 (2005).

## I. FACTS AND BACKGROUND

The government charged defendant and about thirty other members of the Latin Kings street gang with racketeering and drug-related offenses. Following a nine-week trial, a jury convicted defendant of racketeering (count one), racketeering conspiracy (count two) conspiracy to distribute controlled substances (count three), and distribution of marijuana (count ten). The evidence showed that defendant was a leader of the Kings, responsible for ordering and carrying outs acts of violence designed to enhance the gang's position. The jury specifically found defendant guilty of various violent offenses charged as predicate acts under the RICO count, including the attempted murder of Spanish Cobras on August 13, 1995; conspiracy to murder Spanish Cobras in August 1995; conspiracy and attempted murder of Maniac Latin Disciples ("MLDs") in October 1995; attempted murder of a 2-1 gang member on November 18, 1995; conspiracy and attempted murder of an Imperial Gangster in May 1996; murders of George Staninszeski and Frank Correa, and attempted murder of John Thomas on July 16, 1996; attempted murder of Eric Caraballo and murder of Daryl Davis on September 2, 1996; attempted kidnaping and conspiracy to murder Benjamin Drews in November 1996; and kidnaping of Scott Belhumeur on November 5, 1996.

The probation office prepared a pre-sentence report (PSR) in anticipation of sentencing, which set defendant's offense level at 53 and his criminal history category at V, producing an imprisonment range of life. I sentenced defendant to life on counts one and two, twenty years' imprisonment on count three, and five years' imprisonment on count ten, with the sentences to run concurrently. Defendant appealed, and the court of appeals

affirmed his conviction. However, because defendant's direct appeal was pending when the Supreme Court issued Booker, the court ordered a limited remand of the sentence pursuant to the procedure for such cases outlined in Paladino.

## II. DISCUSSION

**A.  Sentencing Procedure**

Following Booker, I follow a three-step sentencing procedure. First, I determine the advisory sentencing guideline range. Second, I decide whether to grant any departures pursuant to the Sentencing Commission's policy statements. Finally, I select a sentence that is sufficient but not greater than necessary given all of the factors set forth in 18 U.S.C. § 3553(a). E.g., United States v. Cull, 446 F. Supp. 2d 961, 962 (E.D. Wis. 2006).

In the present case, both sides agree that the properly computed guidelines recommend a life sentence, and defendant concedes that none of the Commission's policy statements support a downward departure. However, defendant contends that a sentence of less than life imprisonment is sufficient under the factors outlined in § 3553(a).

**B.  Section 3553(a)**

Post-Booker, § 3553(a) directs the court to consider seven factors in imposing sentence:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed–

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

3

> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the now-advisory guideline range;
>
> (5) any pertinent policy statements issued by the Sentencing Commission;
>
> (6) the need to avoid unwarranted sentence disparities; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The ultimate command of the statute is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Id.

**C.  Analysis**

    **1.  Nature of Offenses**

Defendant served as leader, or "Inca," of the "Junior Kings." The role of the Junior Kings was to carry out acts of violence, maintain security and hold guns for the benefit of the Latin Kings. As leader, defendant both ordered others to commit acts of violence and carried out such acts himself.

For instance, on August 13, 1995, defendant had a confrontation with Luis Caban, a member of the Spanish Cobras. Later that day, defendant and other Kings saw Caban and Salvatore Canzonerri drive by, pursued them in a car and fired shots at them. After Canzonerri's car became disabled, defendant shot him as he sought cover behind the car. Later that day, defendant ordered members of the Kings to attack Spanish Cobras, resulting in one Cobra, Helberto Chavez, being shot in the face. On October 4, 1995,

4

Case 2:98-cr-00104-LA    Filed 11/03/06    Page 4 of 11    Document 2410

defendant ordered members of the Kings to shoot at the house of a suspected MLD member, James Wilson. The gun used in that shooting (as well as the Canzonerri/Caban shooting) was later recovered from defendant's house. On November 18, 1995, defendant saw Jose Zamora, a suspected member of the rival 2-1 gang, walking down the street and ordered another King, Michael Hobbs, to shoot Zamora. When Hobbs declined, defendant took Hobbs's gun and shot Zamora, seriously injuring him. On May 19, 1996, defendant again ordered Kings to attack Spanish Cobras, resulting in one Cobra, Christopher Rivera, being shot in the face. Defendant later ordered that a member of the Kings' hit squad be beaten because the Cobra had only been injured and not killed. On May 26, 1996, defendant again ordered an attack, this time on the Imperial Gangsters, which resulted in one member of that gang being shot in the legs. In July of 1996, defendant ordered a hit squad to target members of the MLDs who had moved into a home near King territory, and on July 16, three members of the Kings shot and killed Staninszewski and Correa, and wounded Thomas. Defendant congratulated the members of the squad on their success. On September 2, 1996, defendant opened fire on Caraballo, a member of the East Side Mafiosos, who had moved into a home in King territory. Caraballo suffered only a graze wound, but Davis, who was with Carabello, was killed as he attempted to flee. Defendant then ordered a King to hide the murder weapon, and ordered other Kings to find and kill Caraballo.

On November 13, 1996, defendant and others Kings attempted to kidnap and murder Drews, whom they suspected of cooperating with the police. Fortunately, police were able to intervene as defendant tried to drag Drews into a car. Also in November 1996, defendant and other Kings kidnaped Belhumeur, whom they suspected had

5

information about marijuana and money stolen from the gang. Defendant and his crew took Belhumeur to the basement of a home used by the Kings, bound him to a pole, placed a shotgun to his head, and beat him. At one point, a King put a gun in Belhumeur's mouth and pulled the trigger so he could hear the click, and later put a lit cigarette out on his chest. The Kings left Belhumeur bound in the basement, and he later escaped.

Finally, in addition to the foregoing acts of violence, defendant was a large-scale drug dealer, conspiring with others to distribute controlled substances for the benefit of the Kings. Defendant's role in trafficking included operating drug houses, from which the Kings sold marijuana and crack in large amounts. According to the PSR, defendant's drug weight was over 30,000 kilograms of marijuana equivalent, which placed him at the top of the drug trafficking guideline.

Defendant offers absolutely no mitigation for any of his conduct, which is among the most violent, depraved and indifferent to human life imaginable.

**2.   Character of Defendant**

At the time of his original sentencing, defendant was twenty-four years old and had already compiled a serious record, including convictions or adjudications for burglary, car theft, theft, endangering safety by use of a dangerous weapon, possession of marijuana and battery to a law enforcement officer. He dropped out of high school and had no employment record prior to leaving Milwaukee for Rochester, New York in 1998. As discussed above, he was an active member of a violent street gang, arising to a leadership position. Defendant fathered three children with two different women and owed child support, but he did not know the amount. His girlfriend (the mother of two of his kids)

made positive statements about defendant to the PSR writer, but admittedly knew nothing of his involvement with the Latin Kings. Defendant admitted daily use of marijuana but stated it was not a problem for him. In sum, there was little positive in defendant's character and background.

In his Paladino submission, defendant attempts to present some positive character evidence. First, defendant notes his difficult upbringing. Defendant grew up without a father, as his mother was forced to flee due to his father's alcoholism and abusiveness. Defendant's mother was left to raise him, his brother and two sisters alone. Defendant notes that his mother moved the family from Chicago to Milwaukee when he began getting involved with gangs, but the Latin Kings were also organized in Milwaukee and, looking for a place to belong, he joined.

In a letter, defendant's half-brother Michael states that their mother was an alcoholic, who got involved with abusive men. He writes that in the absence of stability, defendant took responsibility for the family. Michael indicates that at the age of thirteen, he went to live with his father, which improved his situation, but defendant had nowhere else to go. Michael states that their lives then took different paths, he went into the Army, while defendant became involved in criminality.

I accept that defendant's childhood was less than idyllic,[1] and that he likely joined the Kings to feel a sense of community and family. However, as with several others charged in this case, defendant took things much further. He arose to a leadership

---

[1] I do note that defendant told the PSR writer that there was no history of violence or substance abuse in his family while growing up (PSR ¶ 285), which is contrary to the position he takes now.

7

position within the gang, which he clearly relished, and which he used to commit the egregious crimes discussed above.

Second, defendant states that for a period of time prior to his indictment he left the gang and lived a pro-social life. In 1997, he and his girlfriend and their two children moved to Rochester, New York, and established a home. Defendant worked in a factory and supported his family, and states that these were the best months of his life. Defendant was arrested in 1998 following issuance of the indictment in this case and has been in custody ever since. Defendant contends that although this period of his life was brief, it demonstrates that he can be a productive member of society.

Defendant's claim that he left the gang behind is unpersuasive. For instance, he glosses over his participation, along with other Kings, in a violent attack on a jail guard while he was detained awaiting trial in this matter. Defendant was charged in state court and sentenced to ten years in prison for his role in the attack. The government also notes the trial testimony that, although defendant purported to step down as a gang leader, he maintained contact with and continued to attempt to exercise influence over the gang. The evidence also suggested that defendant sought to distance himself from the gang due to the prospect of charges being issued, rather than a desire to break away and make a fresh start.

Third, defendant states that his family would greatly benefit from his presence. He notes that his oldest sister struggles with drug addiction and resultant petty criminality, which has harmed her four children. He further notes that his own children have no parents, as his girlfriend was later murdered. Defendant's pastor writes that while the church assists defendant's children, they need the direction of a father figure in the home.

8

Defendant likely could help his family if released. However, given the severity of his crimes, no reasonable sentence will allow defendant's release in time to help raise these children.

Finally, defendant points to the studies which show that recidivism tends to decline with age. That may be true in the average case, but I must consider such generalities with an eye on the particular circumstances of this case, including defendant's continued violent conduct while confined. Defendant notes that he has taken advantage of opportunities in prison, obtaining his GED in July 2005, as well as taking other classes. This is all to defendant's credit, but I cannot conclude that it overcomes the negatives in his background.[2]

### 3. Purposes of Sentencing

A life sentence is necessary to satisfy the purposes of sentencing in this case.

First, a life sentence is necessary to satisfy the need for just punishment and reflect the seriousness of the offenses. Defendant participated in numerous murders, shootings, and violent kidnapings. The most serious sentences should be reserved for the most serious crimes, and defendant's offenses qualify as the worst a federal court sees. A life sentence is also necessary to promote respect for law. Society will not tolerate violent gangs terrorizing neighborhoods and decreasing quality of life. I also consider the

---

[2]Defendant states that such post-offense rehabilitation is a valid basis for a downward departure, citing United States v. Smith, 311 F. Supp. 2d 801, 810 (E.D. Wis. 2004). However, unlike in Smith, the conduct defendant cites occurred post-sentencing, not post-offense. The guidelines state that post-sentencing rehabilitation is not a basis for departure. U.S.S.G. § 5K2.19. While I am not bound by that provision, I do consider it. See 18 U.S.C. § 3553(a)(5).

9

statements of the family members of defendant's murder victims, which convince me that respect for the law can be satisfied with nothing less than a life term.

Second, a life sentence is necessary to afford adequate deterrence to criminal conduct. Gang leaders who engage in repeated acts of violence must understand the severe consequences of their acts.

Third, a life sentence is necessary to protect the public from defendant. As discussed above, defendant engaged in multiple murders, shootings and kidnapings, which demonstrate total disregard for human life. He also engaged in a brutal attack on a prison guard, which shows that even while confined and facing substantial prison, he is willing to engage in violence. Defendant states that recidivism tends to lower with age, and that by the age of fifty or sixty he will no longer pose a threat and should be allowed to live out his life with his loved ones. However, this argument could be made under § 3553(a)(2)(C) against any life sentence. Congress and the Sentencing Commission have determined that life sentences are in some cases necessary, and I find that this is such a case. Further, given his conduct and unwillingness to leave the gang behind, I cannot determine that the danger posed by defendant will substantially decline with age.[3] See United States v. Bullion, No. 06-1523, 2006 U.S. App. LEXIS 25860, at *7 (7th Cir. Oct. 19, 2006) ("[G]iven the defendant's unusually violent criminal history and the fact that even an elderly person has enough strength to pull the trigger of a shotgun, the district judge could certainly worry about what the defendant might do in his seventies.").

---

[3]Defendant's pastor writes that defendant is a changed man and deeply feels the responsibility of ensuring that his children are raised properly. I do not see substantial evidence of change and, as noted above, no reasonable sentence for multiple murders will allow defendant to be released in time to raise his children.

Fourth, there is no indication that defendant's correctional treatment needs are better served by an alternate sentence. Defendant is furthering his education in prison, which is to his credit.

Finally, a life sentence best promotes the need to avoid unwarranted disparity. See 18 U.S.C. § 3553(a)(6). Defendant's guideline range is life; in fact, his offense level is well above that needed to support a life sentence. And the other main players in the Latin Kings who engaged in similar violence – Andrew Acosta and Pedro Martinez – also received life sentences. A sentence of less than life under these circumstances would create disparity, which cannot be justified based on the circumstances of the case.[4]

### III. CONCLUSION

For the reasons stated, I determine that I would impose the same sentence knowing that the guidelines are advisory. The Clerk is directed to transmit this memorandum to the court of appeals.

**SO ORDERED**.

Dated at Milwaukee, Wisconsin this 3rd day of November, 2006.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

---

[4] Defendant also owed over $4000 in restitution to the Crime Victim Compensation Program, which, given his lack of employment in the community, he would be more likely to pay in prison under the terms of the Inmate Financial Responsibility Program, as originally ordered. See 18 U.S.C. § 3553(a)(7).

11